UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTHEW L. CHATHAM and
ERIN CHATHAM,

   Plaintiffs,      No. 17-CV-11473-IT

v.

DANIEL J. LEWIS and
CANTERBURY VENTURES, LLC,

   Defendants.

**REPORT AND RECOMMENDATION ON DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

CABELL, U.S.M.J.

Plaintiffs Matthew and Erin Chatham hired Daniel Lewis, the principal of Canterbury Ventures (Canterbury)[1], to build a home they designed on a lot Lewis owned, with the mutual expectation that the Chathams would purchase the home and lot once completed. The Chathams brought suit when, following a series of disputes, Lewis began marketing the house for sale on the open market. The complaint presently asserts claims for copyright infringement of Matthew Chatham's architectural plans, breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Mass. G.L. c. 93A. The defendant moves for summary judgment on all counts except for the chapter 93A claim. (D. 89).

---

[1] Lewis and Canterbury are referred to singularly as "the defendant."

The matter has been referred to this court for a Report and Recommendation. (D. 39). Following a careful review of the parties' submissions and the evidence adduced at a hearing on the motion, I recommend that the motion be **DENIED.**

## I.  RELEVANT FACTS

The facts are undisputed unless otherwise noted. In 2016, the Chathams decided to have a new home built for themselves and their children. (D. 112; Plaintiffs' Response to Defendants' Local Rule 56 Concise Statement of Material Facts in Support of Defendants' Motion for Partial Summary Judgment (Pltf. SOF) ¶ 1). The house was to be constructed according to a design conceived by Matthew Chatham. (D. 113; Declaration of Matthew L. Chatham in Opposition to Defentant's [sic] Motion for Partial Summary Judgment (M. Chatham Aff.) ¶ 1).

The Chathams identified Lot 5 on Amber Drive in Wrentham as the preferred location for their home and initially contacted a builder named Kevin Porter about purchasing the lot and constructing the home. (Pltf. SOF ¶¶ 1-3). When Porter told Matthew Chatham that his plans would have to be formalized into construction drawings, Chatham asked Porter to have Golemme Mitchell Architects (GMA), an architectural firm with which Porter was familiar, submit a proposal for such work. (Id. ¶ 3).

GMA corresponded with Porter about the plans and Porter paid the retainer deposit to GMA for the project initiation. (D. 93;

Affidavit of Neil J. Bingham in Support of Defendants' Motion for Summary Judgment (Bingham Aff.) Exh. I, J).  However, the Chathams and Porter never came to a purchase and sales agreement, and the Chathams claim that they ultimately paid for the work performed by GMA.  (Pltf. SOF ¶¶ 2, 5).

Thereafter, on July 27, 2016, the Chathams signed a Purchase and Sales Agreement (P&S) with the defendant under which the defendant would purchase Lot 5 and finance the construction.  The parties do not dispute that a true and correct copy of the P&S is attached to the plaintiffs' Second Amended Complaint (Sec. Am. Compl.) as Exhibit 3.  (D. 51).

The closing was set for January 12, 2017.  Pertinent here, the P&S provided that:

> ¶8:  If the SELLER [is] unable to give title or to make conveyance, or to deliver possession of the premises, . . . or if at the time of the delivery of the deed the premises do not conform . . . , the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession . . . , or to make the said premises conform . . . , in which event the time for performance hereof shall be extended for . . . 60 days . . . .

> ¶9:  If at the expiration of the extended time the SELLERS shall have failed . . . to . . . deliver possession, . . . then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

> ¶10:  The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in

3

their then condition and to pay for therefor the purchase
price without deduction . . . .

¶28:  The BUYERS shall have access to the premises at
reasonable times and upon reasonable notice for appraisals,
taking measurements, etc., prior to the final walk-through,
and in the presence of a real estate broker involved in this
transaction.

The parties also simultaneously executed a Rider to the P&S,
also part of Exhibit 3, providing that "in the event of any
conflict between this Rider and the said Standard Form Purchase
and Sale Agreement, the terms of this Rider shall control."
Paragraph 18 of the Rider states:

Seller shall . . . prior to the closing have all work as
specified in this agreement completed in a workman like
[sic] manner, subject to the reasonable approval of the
Buyer and a home inspector of buyer's choice.  Buyer shall
submit a punch list to Seller for work which must be
completed prior to closing.  . . .  If any or all of the
work is not completed and approved by Buyer and Buyer's
home inspector, prior to the date of closing, . . . then a
sum equal to . . . 150% of the cost of said work shall be
held in escrow and the work shall be finished within four
weeks from the date of closing . . . .  In no event shall
the Seller have any right to close without full completion
of the work without prior approval of Buyer's lender and
Buyer.

The defendant asserts that Matthew Chatham never mentioned
during negotiations that he claimed any ownership in the plans.
(D. 91; Defendants Daniel J. Lewis and Canterbury Ventures, LLC's
L.R. 56.1 Concise Statement of Material Facts in Support of
Defendants' Motion for Partial Summary Judgment (Def. SOF) ¶ 6);
D. 95; Affidavit of Daniel J. Lewis in Support of Motion for

Summary Judgment (Lewis Aff.) ¶ 5).  Conversely, Chatham claims that he repeatedly informed Lewis that he considered the plans to be his intellectual property and that Lewis acknowledged that he could not build the house for someone other than the Chathams. (Pltf. SOF ¶ 8; M. Chatham Aff. ¶ 5).  No contemporaneous documentation in the record speaks to any copyright interest.

The Chathams asked Lewis either to purchase the plans from GMA or reduce the sales price to reflect the cost of the plans. (Lewis Aff. Exh. A).  When Lewis refused, the Chathams purchased the building plans and supplied them to Lewis on or about August 10, 2016.  (M. Chatham Aff. ¶ 10).  Although not possible to read on the copy filed with the court, the parties agree that a true and correct copy of the building plans from the architect is attached as Exhibit 2 to the plaintiffs' Second Amended Complaint and bears essentially the following language:

> Copyright 2016 by Golemme Mitchell Architects.  The architectural plans, drawings, designs, specifications and other arrangements on this sheet are and shall remain the property of Golemme Mitchell Architects, LLC.  No part thereof shall be copied or disclosed to others, or used in connection with any work or project, other than the specified project for which they have been prepared and developed, without expressed knowledge or written consent of Golemme Mitchell.

(D. 126; Transcript of Motion Hearing Oct. 30, 2018 (Transcript) p. 53, ll. 20-25 – p. 54, ll. 1-15).

The defendant did not obtain the deed to Lot 5 until November 3, 2016, or a building permit from Wrentham until December 13,

2016. (Lewis Aff. Exh. C, F). Lewis admits that part of the delay was due to "Canterbury's error in not filing a building permit for the Town of Plainville," in which a portion of the lot was situated. (D. 90; Defendants Daniel J. Lewis and Canterbury Ventures, LLC's Memorandum in Support of Partial Motion for Summary Judgment (Def. Memorandum) p. 4). However, Lewis also encountered unanticipated difficulties installing a well that met potable water requirements and health regulations. He began installation of that well in October 2016 but had to increase the depth to 600 feet before flow was adequate. (Lewis Aff. Exh. D). Then, toluene levels were too high, and the Plainville Board of Health did not approve the well until December 6, 2016. (Id.).

As the original closing date of January 13, 2017 drew near, Lewis had not even poured the foundation for the home. The defendant maintains that by the time he was able to obtain all permits, temperatures were too low to pour footings for the foundation. (Lewis Aff. ¶ 14). Matthew Chatham contends, however, that the defendant failed to pour the footings despite several days on which the weather was suitable and on which he saw other foundations being poured. (M. Chatham Aff. ¶ 12).

On January 11, 2017, Lewis stated in an email to Matthew Chatham that "[t]he plans for the house are your property and as such I am not entitled to build that house once we are out of contract if you decide not to do an extension." (Bingham Aff.

6

Exh. K).  Chatham forwarded this email to his attorney with his own comments, one of which was "IS THIS TRUE?" immediately following "extension."  (Id.).

Lewis asked for a 120-day extension for construction, but the parties could not agree on terms, particularly that the plaintiffs release Lewis from any liability.  (D. 94; Affidavit of Michael E. Heaney in Support of Defendants' Motion for Summary Judgment (Heaney Aff.) Exh. A).  Therefore, the contract was extended 60 days under paragraph 8 of the P&S.  (Def. SOF ¶ 28).  As that date -- March 12, 2017 -- approached, the home was still not near completion.

At some point in February 2017 Lewis contacted GMA[2] about buying the plans for the Lot 5 home, because he was concerned that the project would not move forward.  (M. Chatham Aff. Exh. E).  Erin Fullam, a principal of GMA, informed Matthew Chatham that she told Lewis that she would have to see if Chatham would release the plans or if GMA could otherwise make enough revisions to distinguish a new design from the Chatham design.  (Id.).  Her firm's "common moral practice is not to reuse other people's designs especially if the client worked as closely through the design process as [Chatham] did (space planning in a home cad

---

[2] In the intervening time period, GMA had become CME Architects.

program) without receiving approval from the client." (Id.) (parentheses in original).

In mid-March of 2017, the parties and their real estate attorneys met to try to negotiate a new completion date for the home. (Pltf. SOF ¶ 33). The Chathams claim that the parties orally agreed to extend the contract, and it is undisputed that Lewis continued working on the home in conjunction with the Chathams until approximately mid-May of 2017. (Pltf. SOF ¶¶ 33, 34; Lewis Aff. Exh. C (email from Lewis' realtor to the Chathams' realtor dated May 10, 2017, stating that "[i]f we can't resolve this then we respectfully ask to be released from this contract")).

However, although the plaintiffs' attorney sent several proposed written extension agreements to the defendant's counsel, Lewis would not sign them because the Chathams would not execute a release. (D. 116; Defendants' Reply Memorandum in Support of Partial Motion for Summary Judgment (Def. Reply) Exh. 1, 3). Therefore, no formal written extension was ever executed.

On May 15, 2017, Matthew Chatham's attorney sent a letter to Lewis advising him that Chatham owned a copyright in the home design that was registered with the United States Copyright Office. A copy of this letter is attached to the plaintiffs' Second Amended Complaint as Exhibit 5. According to the attorney, the only right Lewis had to the plans or the house was "a non-exclusive license

by Mr. Chatham to his original, copyrighted design for the sole purpose of building him this home on Lot 5 Amber Dr."

Two days later, the defendant's attorney sent a letter to the plaintiffs' counsel seeking to resolve the dispute and complete construction. (M. Chatham Aff. Exh. F). This letter proposed that the Chathams pay for three items "to continue in [the parties'] contractual relationship:" an initial $78,900 deposit (which was in escrow); $7,200.00 for window upgrades, for which the Chathams had requested but not received a detailed invoice (also held in escrow); and the additional cost for an authentic stone exterior, which the Chathams believed should already be covered by the contract price. (Id. ¶¶ 16-17). The letter also claimed that Canterbury had continued to perform construction "in good faith *and in accordance with the P&S*," but would terminate the P&S if the Chathams did not deliver the deposit, pay for the windows, and agree to pay for stone by May 19. (Id. Exh. F) (emphasis added).

On May 25, 2017, the defendant's counsel sent a letter to the plaintiffs' attorney confirming that the agreement between the parties was terminated. (Id. Exh. G). Canterbury said it was prepared to return deposits to the Chathams upon their execution of a release, but the Chathams never executed such a release.

There is no dispute that the defendant was marketing the house for sale to third parties by the summer of 2017.

## II.   ANALYSIS

### A. Standard for Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).

Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "'show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.'" *Fontánez-Nuñéz v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (quoting *Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). Instead, the opposing party must "'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (quoting *Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id*. (citing *Nicolo v. Philip Morris, Inc*., 201 F.3d 29, 33 (1st Cir. 2000)). "'A factual issue is genuine if it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make a choice between the parties' different versions of the truth at trial.'" *DePoutout v. Raffaelly,* 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Ocso Drugs, Inc*., 895 F.2d 46, 48 (1st Cir. 1990)). Material facts are those that can sway the outcome of the litigation. *Id.*

### B. **The Copyright Infringement Claim**

#### 1. The Parties' Contentions

The plaintiffs assert that Matthew Chatham holds a valid copyright in both the architectural plans for the house and the house itself as the embodiment of those plans. They contend that Chatham granted the defendant a license to use the plans to build a house for sale to the Chathams only, and that the defendant exceeded this license and infringed on the copyright when he began marketing the house for sale on the open market.

The defendant argues that he did not infringe because: (1) Matthew Chatham never asserted or reserved a copyright in the building plans when he gave them to the defendant; (2) GMA rather

than Matthew Chatham is the actual holder of a copyright if there is one; (3) even assuming Chatham holds a copyright interest in the plans he granted the defendant a license which permitted the defendant to use the plans to potentially sell the house to a third party; and (4) the defendant would in any event be permitted to sell the house under the first sale doctrine.

2. <u>Legal Framework</u>

A party asserting copyright infringement must establish ownership of a valid copyright and copying of original parts of the copyrighted work by the infringer. *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Trust Safe Pay, LLC v. Dynamic Diet, LLC,* No. 17-cv-10166, 2018 WL 3614799, at *3 (D. Mass. July 27, 2018). Registration is a prerequisite to filing a lawsuit claiming infringement, but it is not necessary to create the copyright itself. 17 U.S.C. § 411(a); *Torres-Negrón v. J.& N. Records, L.L.C.*, 504 F.3d 151, 156 (1st Cir. 2007).[3]

"A certificate of copyright constitutes prima facie evidence of ownership and originality of the work as a whole. Upon the plaintiff's production of such a certificate, the burden shifts to the defendant to demonstrate some infirmity in the claimed

---

[3] In *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), the Supreme Court determined that the registration prerequisite does not restrict a federal court's subject matter jurisdiction. However, the Court declined to address whether registration is a mandatory precondition to suit that district courts may or should enforce *sua sponte* by dismissing copyright claims based on unregistered works. *Id.* at 171. This court need not resolve the issue because the work at issue here was registered.

copyright." *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005) (citation omitted).

The Copyright Act expressly covers "architectural works," defining them as "the design of a building as embodied in any tangible medium of expression," including "a building, architectural plans, or drawings." 17 U.S.C. §§ 101, 102(a). Here, it is undisputed that Matthew Chatham holds a certificate of copyright for the Chatham building plans for "architectural work" pursuant to 28 U.S.C. § 102(a)(8).

A copyright vests the holder with certain exclusive rights, including the right to reproduce any or all of the copyrighted work. *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 108 (1st Cir. 2006). Where architectural plans are involved, the copyright owner may claim infringement of both the plans and any structure based on the plans. *See* H.R. Rep. 107-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6950; *see also Yankee Candle Co. v. New England Candle Co.*, 14 F. Supp.2d 154, 158 (D. Mass.), *vacated pursuant to settlement,* 29 F. Supp.2d 44 (D. Mass. 1998).

3. Discussion

   i.  *No Copyright Interest Asserted*

Although the record provides prima facie evidence that Matthew Chatham owns a copyright in his architectural plans where he registered them, the defendant argues that he did not have (or should not be seen to have had) a copyright in the plans because

13

he did not reserve or assert any copyright interest when he initially discussed the plans with the defendant, or when he signed the P&S, or when he supplied the plans to the defendant. (Lewis Aff. ¶ 5-7). This argument has no merit. Even assuming Chatham failed as alleged to apprise the defendant of his copyright at any of these junctures, it is of no legal consequence because silence does not affect the validity of an existing copyright. Rather, a copyright vests at the time of "the creation or fixation of an original work of authorship in a tangible medium of expression," and does not require either registration or assertion to be valid. *See Chere Amie, Inc. v. Windstar Apparel Corp.*, 191 F. Supp.2d 343, 350 (S.D.N.Y. 2001). As noted, Chatham is deemed to have a valid copyright where he registered his plans. *Johnson*, 409 F.3d at 17. There would in any event be a genuine dispute of fact on this issue where Chatham contends that he repeatedly told Lewis he owned the plans, that he specifically told Lewis he was concerned about another house in the development that had allegedly been copied without consent, and that Lewis assured him that he knew that he could not build the home for anyone but the Chathams. (M. Chatham Aff. ¶ 5).

    *ii.  GMA's Status as a Copyright Holder*

The defendant argues next that, assuming the plans were copyrighted, GMA alone held the copyright, either because Chatham ceded his copyright to GMA when GMA created the building plans, or

because GMA held the copyright from the moment of the plans' inception.   In support of this argument the defendant cites to GMA's initial proposal to create the plans, which provided that "unless otherwise provided, the GMA shall be deemed the Author of these documents and shall retain all . . . reserved rights, including copyright." (Bingham Aff. Exh. I).   The defendant also points to the formal plans the Chathams gave Lewis in August 2016, which bear a GMA copyright notice.  (Sec. Am. Compl. Exh. 2).

The court does not find this argument persuasive.  First, the language standing alone, without context, is not dispositive regarding ownership, particularly where there has been no evidence adduced regarding its origins, e.g., whether it was mere boilerplate language which GMA always used or was by contrast language included as a result of deliberate and conscious discussions between GMA and Matthew Chatham.  Regardless, there is evidence notwithstanding this language that Chatham purchased the plans and that Lewis told Chatham that he understood Chatham owned the house plans.  (M. Chatham Aff. ¶¶ 8-10).  Similarly, Chatham avers that GMA's principal, Erin Fullam, acted in a manner consistent with the understanding that Chatham owned the plans, and refused to provide Lewis with a copy of the plans without Matthew Chatham's approval.[4]  (M. Chatham Aff. Exh. 5).  As such,

---

[4] Neither party appears to have obtained discovery from Fullam or any other GMA architect who worked with the Chathams.  Chatham's assertion as to what Fullam told him constitutes inadmissible hearsay statements for Rule 56

the record does not demonstrate indisputably that GMA rather than Chatham was the copyright owner of the plans.

    *iii. Scope of License*

    The defendant argues next that, assuming Matthew Chatham had a valid copyright in the plans, Chatham granted him a license to use the plans to construct the house and he did not exceed the scope of the license when he subsequently proceeded to market the house for sale to others.

    A license to use a copyright does not need to be in writing and may be granted orally or implied by conduct manifesting the owner's intent. *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 41 (1st Cir. 2010); *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). Factors bearing on intent include (1) whether the parties had a short-term versus ongoing relationship; (2) whether any written contracts state that the copyrighted material could be used only with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that the use of the material without the creator's involvement or consent was permissible. *Hevia*, 602 F.3d at 41.

---

purposes and have not been considered, but the court does credit Chatham's assertion based on his firsthand interaction with Fullam that she interacted with him in a manner consistent with the notion that Chatham owned a copyright in the plans.

Here, there is no dispute that the Chathams authorized the defendant to use plans to construct a house on Lot 5. There is, however, a genuine dispute as to whether that authorization went so far as to permit Lewis to sell the house to anyone other than the plaintiffs. Notwithstanding the defendant's contention, Matthew Chatham averred that he told Lewis that "my home design could only be built for me," and that Lewis "acknowledged that he had discussed the issue with his counsel and agreed that the design was my intellectual property and that he could not build the house for someone other than me." (M. Chatham Aff. ¶ 5). Because a factfinder crediting this evidence could conclude that Chatham at most authorized the defendant to use the plans to construct a house solely for the plaintiffs' benefit, this argument provides no basis for relief.

   *iv. First Sale Doctrine*

Finally, the defendant argues that marketing the property for sale did not constitute copyright infringement because he would have been permitted to sell the property under the first sale doctrine. That doctrine provides that,

> [n]otwithstanding the provisions of section 106(3), the owner of a particular copy . . . made lawfully under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . .

17 U.S.C. § 109(a). The first sale doctrine thus significantly limits the exclusive distribution right of the copyright owner

17

"only to the first sale of the copyrighted work." *Quality King Distrib., Inc. v. L'anza Research Int'l, Inc.,* 523 U.S. 135, 141 (1998). "Once the copyright owner places a copyrighted item into the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Id.* at 152. Once that happens, "the person to whom the copy . . . is transferred is entitled to dispose of it by sale . . . or any other means." *See Microsoft Corp. v. Harmony Computs. & Electrs., Inc.*, 846 F. Supp. 208, 212 (E.D.N.Y.1994) (quoting Historical Note to 17 U.S.C. § 109). Conversely, a copyright holder does not lose his right to control distribution of copies of his work that have never been sold. 17 U.S.C. § 109(d) ("The privileges prescribed [in subsection (a)] do not, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it.").

The defendant reasons that because he lawfully owns the house by virtue of having financed the purchase of the lot and the construction, and because the plaintiffs did not purchase the house under the terms of the P&S, he would have the right under the doctrine to sell the home as he sees fit. But even accepting that the defendant owns Lot 5, and even assuming *arguendo* that the defendant might be entitled to sell Lot 5 if the Chathams opted not to buy it, the first sale doctrine does not apply to these

facts because it only applies where the original copyright owner -- Chatham in this case -- has *sold* the copy at issue to another. By contrast, it does not apply where the owner has merely authorized one to possess and use the copy.  See 17 U.S.C. § 109(d); *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010) ("The first sale doctrine does not apply to a person who possesses a copy of the copyrighted work without owning it, such as a licensee.").  That is the case here; Chatham authorized Lewis to make use of his plans but it is undisputed that he did not sell him the plans.  On these facts, then, the first sale doctrine is simply inapplicable.  17 U.S.C. § 109(d).

### C. **The Breach of Contract Claim**

#### 1. The Parties' Contentions

There is no dispute that the parties executed and initially operated pursuant to a written contract consisting of the P&S and the Rider.  There is also no dispute that, although the parties contemplated that the house would be completed and then sold to the plaintiffs on January 12, 2017, that did not happen, and paragraph 8 of the P&S effectively gave the defendant an additional 60 days, to mid-March, to complete construction.  There is further no dispute that the house was still not completed by that time.

Against that backdrop, the plaintiffs contend that the parties orally agreed in mid-March 2017 to extend the contract so the house could be completed, and that the contract remained in

effect until late May 2017, when the defendant breached it by unilaterally terminating it.  They contend also that the defendant breached Paragraph 28 of the P&S and Paragraph 18 of the Rider by refusing to grant them access to the premises.

The defendant argues inappositely that once he was unable to complete construction by the end of the 60-day extension period in mid-March, the contract essentially ended and Paragraphs 9 and 10 of the P&S required the plaintiffs to elect between demanding their money back or buying the house as-is.  The defendant argues that the plaintiffs breached the contract when they failed to elect either option, leaving the defendant free of any obligation to sell the house to the plaintiffs.  The defendant contends that the parties never orally extended the contract beyond mid-March and that Paragraph 18 of the Rider regarding access to the premises never came into play because it sets out nothing more than a provision allowing for an inspection to deal with "punch list" items in anticipation of a closing.

2. <u>The Applicable Law</u>

To establish a breach of contract under Massachusetts law, the plaintiffs must show that a valid, binding contract existed, that the defendant breached the terms of the contract, and that the plaintiffs sustained damages as a result of the breach.  *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007).  Even where, as in this case, a purchase and sale agreement

requires extensions to be in writing (Sec. Am. Compl. Exh. 3 p. 6, ¶ 24), an oral extension of a closing date can be valid.  *See Simpson v. Vasiliou*, 29 Mass. App. Ct. 699, 701 (1991) (parties may waive no oral modification clause and orally agree to extend closing date).  An oral agreement can be established through the conduct of the parties, and if such conduct conforms with the oral rather than the written agreement, it can be inferred that the parties have agreed to be bound by the oral contract.  *See Shinkel v. Maxie-Holding, Inc.*, 30 Mass. App. Ct. 41, 47 (1991).  Whether the parties extended their agreement, and/or the terms of such an extension, encompasses questions of fact.  *See, e.g., Beal Bank S.S.B. v. Krock*, 187 F.3d 621 (1st Cir. 1998) (a party's intent to relinquish contractual rights by entering into a subsequent agreement is a factual question).  Summary judgment is not appropriate on a contract claim if there are genuine issues of material fact concerning whether and how an oral agreement modifies a written one.  *See Barletta Heavy Div., Inc. v. Erie Interstate Contractors*, Inc., 778 F. Supp.2d 109, 114 (D. Mass. 2011) (applying Massachusetts law).

### 3. Discussion

Applying the foregoing here, summary judgment is not appropriate on the plaintiffs' breach of contract claim because there is a dispute of material fact as to whether the parties orally agreed to extend the P&S and Rider beyond March 2017.

Despite the defendant's contention that the parties' contract ended in March when the plaintiffs failed to elect an option under Paragraphs 9 and 10 of the P&S, the plaintiffs have adduced evidence that the parties agreed orally to extend the agreement to allow for completion of the house. Among other things, there is no dispute that the defendant continued working towards completion of the house, with input from the Chathams, from March until late May 2017. Further, and more notably, the defendant's counsel *affirmed* that the contract continued well into late May when he stated to the plaintiffs' counsel in correspondence dated May 17, 2017 that "Canterbury continues to perform construction on the Property in good faith and in accordance with the P&S," and then highlighted a number of issues that needed to be resolved "if the parties are to continue in their contractual relationship." (M. Chatham Aff. Exh. F). Moreover, counsel then purported to terminate the parties' agreement a week later when he wrote on May 25, 2017 that "the agreement is hereby terminated." (M. Chatham Aff. Exh. G).

Counsel's communications coupled with the defendant's continued work on the house provide strong if not dispositive evidence that the parties did orally agree to extend their contract, and that the contract continued to remain in effect until the defendant terminated it. Because a factfinder crediting this evidence could conclude that the defendant did agree orally to

extend the contract beyond March 2017, and then breached the contract by unilaterally terminating it, it follows that the defendant is not entitled to summary judgment on this claim.[5]

### D. **Breach of Implied Covenant of Good Faith and Fair Dealing and Specific Performance**

Finally, the defendant argues that if summary judgment is appropriate on the copyright infringement and breach of contract claims, it is also appropriate on the plaintiffs' derivative claims for breach of the implied covenant and for specific performance. Because the court concludes that summary judgment is not appropriate on the infringement and breach claims, and for the same reasons, it should be denied with respect to these remaining claims as well.

---

[5] To be sure, the parties also dispute the interpretation of certain contract provisions, including whether Paragraphs 9 and 10 of the P&S required the plaintiffs to choose between asking for their money back or buying the house as-is once Lewis failed to complete construction by mid-March.  Lewis argues that they did have such an obligation and therefore breached the contract when they failed to elect.  The plaintiffs counter that those provisions did not control because the Rider provided that it would control "in the event of any conflict between this Rider and the said Standard Form Purchase and Sale Agreement," and Paragraph 18 of the Rider provided that if work was unfinished the seller would be required to deposit into escrow "a sum equal to 150%" of the unfinished work, which they contend the defendant failed to do.  The plaintiffs argue moreover that the defendant would not be entitled to invoke Paragraphs 9 & 10 in any event because he in bad faith deliberately delayed the pace of construction in order to force an end to the contract so that he in turn could sell the house for more money to another party.  *See e.g., See Love v. Pratt,* 64 Mass. App. Ct. 454, 460 (2005); *LaFond v. Frame,* 327 Mass. 364, 367 (1951) (clause providing for return of deposits if seller cannot convey title does not protect an owner acting in bad faith and not intending to carry out agreement).  In the court's view, it is not necessary to resolve questions regarding the interplay of these end-of-contract provisions where the plaintiffs have adduced strong evidence that the contract did not end in March and continued in effect until late May 2017.

### III. CONCLUSION

For the foregoing reasons, I recommend that Defendants Daniel J. Lewis and Canterbury Ventures, LLC's Motion for Partial Summary Judgment (Dkt. No. 89) be **DENIED**.[6]

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  September 12, 2019

---

[6] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376 (1st Cir. 1982); *see also Thomas v. Arn*, 474 U.S. 140 (1985).